UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY RICHARD CONRAD,

                    Plaintiff,

    v.                                      Case No. 17-cv-664-pp

TODD PROCHASKA,

                    Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 49)**

Plaintiff Anthony Richard Conrad, a Wisconsin inmate representing himself, is proceeding under 42 U.S.C §1983 on a Fourth Amendment claim of excessive force against Defendant Todd Prochaska. The defendant has moved for summary judgment, dkt. no. 49, and the plaintiff has opposed the motion, dkt. no. 57. The court denies the defendant's motion because there are disputes as to material facts.

**I.    Facts**

    A.    <u>Procedural Background</u>

The complaint alleges that the defendant violated the plaintiff's Fourth Amendment rights during an arrest on January 8, 2017. Dkt. No. 1. The court screened the complaint and allowed the Fourth Amendment claim to proceed. Dkt. No. 9. The defendant answered, dkt no. 16, moved to compel discovery from the plaintiff, dkt. no. 23, then moved for summary judgment, dkt. no. 27. The

1

court granted the motion to compel, ordered the plaintiff to respond to the defendant's discovery demands, struck the defendant's motion for summary judgment and set new deadlines for completing discovery and filing dispositive motions. Dkt. Nos. 33, 34.

The defendant timely filed his new motion for summary judgment. Dkt. No. 49. He also submitted a statement of proposed material facts in support of his motion for summary judgment, dkt. no. 51, to which the plaintiff responded, dkt. no. 57. The plaintiff contests many of the defendant's proposed findings of fact but has not adequately supported every dispute by referencing evidence in the record that supports his position. See Civil L. R. 56(b)(2)(B)(i). The court will consider the plaintiff's "assertions only to the extent they are clearly and obviously supported by citations to the . . . record." Jenkins v. Syed, 781 F. App'x 543, 545 (7th Cir. 2019) (internal quotation marks omitted). The court will deem admitted any of the defendant's facts that the plaintiff has not properly contested. See Civil L. R. 56(b)(4).

The plaintiff previously submitted a response and a declaration in opposition to the defendant's first motion for summary judgment. Dkt. Nos. 37, 38. Although these documents were not resubmitted with the plaintiff's materials in opposition to the defendant's second motion for summary judgment, the court will consider them to the extent that the plaintiff relies on them in his response to the defendant's statement of proposed material facts, and will consider the plaintiff's declaration at Dkt. No. 38 as his proposed findings of fact. See Civil L. R. 56(b)(2)(B)(ii).

2

The plaintiff also submitted a sur-reply to the defendant's reply brief. Dkt. No. 61. Neither the Federal Rules of Civil Procedure nor this court's Civil Local Rules permit sur-replies and the plaintiff did not seek permission from the court to file one. "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." Watt v. Brown Cty., 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016) (quoting Meraz-Camacho v. United States, 417 F. App'x 558, 559 (7th Cir. 2011)). The defendant did not raise any new arguments in his reply brief, so the court has not considered the plaintiff's sur-reply.

B.     Factual Background

On January 8, 2017, Michael J. Chandler[1] was at a McDonald's restaurant on Monroe Road in Bellevue, Wisconsin, when he noticed that a man in the car next to his was unconscious. Dkt. No. 51 at ¶3. Chandler knocked on the passenger and driver's side doors but the man did not respond. Id. at ¶4. Chandler told management at the restaurant about the unresponsive man and called the Brown County Sheriff's Office. Id. at ¶5.

A few minutes later, the defendant heard over dispatch about the call to report that an adult male was "passed out" in his car in the McDonald's parking lot and responded to the scene. Dkt. No. 51 at ¶¶6, 8. The defendant is a sergeant with the Brown County Sheriff's Department, a position he has held since 2017.

---

[1] Chandler provided a witness statement to the Brown County Sheriff's Department. The defendant has included that statement with his summary judgment materials. Dkt. No. 52-2.

3

Id. at ¶ 2. He has been with the Brown County Sheriff's Department since 2005. Id. It is the practice of the Brown County Sheriff's Department for Emergency Medical Services and Brown County deputies to respond to Brown County dispatch calls for medical assistance. Id. at ¶7. Brown County deputies are trained as first responders and in the administration of first aid. Id. When the defendant responded to the dispatch call, he believed he was responding only to a call for a welfare check. Id. at ¶9. He believed the unresponsive man could be a sleeping trucker or someone experiencing a medical episode but did not anticipate finding the man unresponsive because of drug or alcohol use. Id. at ¶¶10–11.

The defendant avers that he arrived at the McDonald's parking lot and found the vehicle in question. Dkt. No. 51 at ¶12. The car was running and facing the restaurant, the parking lot was full of cars and there were several pedestrians nearby. Id. The defendant observed a white male, later identified as the plaintiff, asleep in the driver's seat of the car; there were no other occupants in the car. Id. at ¶13. The defendant says that the window was open a few inches. Id. at ¶14. The defendant says he knocked loudly several times but that the plaintiff didn't respond. Id. at ¶15. The defendant asserts that he yelled "police" loudly and knocked hard, which woke the plaintiff up. Id. at ¶16.

The defendant relates that he said, "Hello," asking several times if the plaintiff was okay, but that the plaintiff didn't respond; the defendant says he asked the plaintiff's name and got no response. Id. at ¶17. "Eventually," however, the defendant says that the plaintiff nodded when the defendant asked if he was

4

okay. Id. at ¶18. The defendant explains that following this conversation, medical personnel arrived in an ambulance. Id. at ¶19; Dkt. No. 38 at ¶8. The defendant says he asked whether the plaintiff would see the medical personnel, but that the plaintiff didn't respond. Dkt. No. 51 at ¶19. He says that this caused him to be concerned that the plaintiff might either have a medical problem or be under the influence of drugs, so he opened the door of the car. Id. at ¶¶20-21. The defendant asserts that when he opened the car door, "the car moved forward a foot or two and the engine sounded as if it was engaging." Id. at ¶22. The defendant asserts that because he was concerned for his safety and that of the people in the McDonald's and nearby pedestrians, he reached into the car and turned off the ignition; he wasn't able to get the key out of the ignition. Id. at ¶23. He says he could smell alcohol on the plaintiff. Id. at ¶24.

The defendant says that at this point, he asked the plaintiff to step out of the car. Id. at ¶25. He indicates that the plaintiff "refused to answer" him and "assumed a defensive posture;" he says the plaintiff's "arms were pulled back and [the plaintiff] refused to make eye contact or look at [the defendant]." Id. at ¶26. The defendant asserts that based on his experience and training, he though the plaintiff was going to resist the defendant's efforts to "stabilize the situation," so he again asked the plaintiff to step out of the car; the plaintiff responded by asking if he was being detained. Id. at ¶¶27-29. The defendant says he responded that the plaintiff *was* being detained, told the plaintiff that he needed to step out of the car and reached into the car and took hold of either the plaintiff's left arm or one of his legs. Id. at ¶30.

5

The defendant asserts that the plaintiff "jerked away" from him, and that the defendant reached in and used both hands to secure the plaintiff's arm or leg. Id. at ¶31. The defendant says that he noticed a member of the ambulance crew reach in and grab the plaintiff's other hand. Id. at ¶32. The plaintiff again jerked away and told the defendant to "get the fuck away." Id. at ¶33. At this point, the defendant says, he told the plaintiff that he needed to get out of the car or the defendant would use his taser; when the plaintiff didn't move, the defendant pointed his taser at the plaintiff and again told him to get out of the car. Id. at ¶34. The defendant describes the plaintiff as "sitting in a defensive position with his legs pulled up to his chest as if ready to kick at [the defendant]." Id. at ¶35. The defendant says that because of the plaintiff's "constant" refusal to get out of the car, the smell of alcohol and the plaintiff's resistance, the defendant called for backup. Id. at ¶36. He then deployed his taser to the plaintiff's left arm and upper chest area, but the defendant says that because the plaintiff was wearing a thick coat, the taser wasn't effective. Id. at ¶37.

The defendant says the plaintiff then began shouting "fuck you" at him; he says the ambulance crew member reached in and tried to grab the plaintiff again, but that the plaintiff jerked back. Id. at ¶¶38-39. The defendant then reached for his expandable baton, in case he needed it, again telling the plaintiff to step out of the car; the plaintiff again refused. Id. at ¶¶40-41. The defendant indicates that he "thrust his baton at the upper left portion of [the plaintiff's] chest," but the plaintiff still did not comply; the defendant thrust his baton at the plaintiff a second time, with no compliance. Id. at ¶42.

6

The defendant relates that at this point, he "stepped back slightly to reassess the situation and consider his options for proceeding." Id. at ¶43. He says the car still wasn't disabled and the plaintiff still smelled of alcohol; the defendant was concerned that the plaintiff might drive the car into the McDonald's or drive away under the influence. Id. at ¶44. He says his experience also had shown that people in their own cars "may have easier access to guns and [the plaintiff] was clearly agitated;" for these reasons, the defendant did not think that "disengaging was a viable option." Id. The defendant asserts that suddenly, the plaintiff lunged at him, putting his head in the defendant's rib cage; the defendant tried to dodge the plaintiff but "fell on top of him to the ground as he was knocked off balance." Id. at ¶¶45-46. The defendant says he fell on his knees, injuring both of them, and that his left hand was injured when it was crushed underneath [the plaintiff]." Id. at ¶47.

The defendant explains that he tried to stabilize and secure the plaintiff using his body weight, but that he could feel the plaintiff "resisting underneath him" and could feel the plaintiff's hands moving along the defendant's waistline, "near his firearm." Id. at ¶48. All the while, the defendant says, the plaintiff continued to shout obscenities at the defendant. Id. The defendant tried to control the plaintiff's arms and hold him in position, while trying to de-escalate the situation by telling the plaintiff "this [is] over" and ordering the plaintiff to "calm down;" the defendant says the plaintiff kept resisting and shouting obscenities. Id. at ¶¶49-50.

Backup arrived at this point and helped the defendant obtain control of the plaintiff. Id. at ¶51. The backup deputies handcuffed the plaintiff and put him in leg shackles and a spit hood, because according to the defendant, "it appeared [the plaintiff] was trying to spit on officers." Id. at ¶52. The plaintiff was placed on a stretcher and put into the ambulance; the defendant accompanied him to the hospital, the plaintiff "continued to be verbally abusive and threatening in the ambulance." Id. at ¶54.

The plaintiff tells a slightly different version of these events. In his declaration, the plaintiff says that he woke in the McDonald's parking lot to see a man looking through is car; he says he could see only the man's face. Dkt. No. 38 at ¶¶4-5. He indicates that the man asked if he was okay, and the plaintiff responded that he was. Id. at ¶¶6-7. The plaintiff indicates that at this point, he saw the ambulance pull into the parking lot; he says that when he looked back at the man, the man had "moved his position," revealing to the plaintiff that the man was in a law enforcement uniform. Id. at ¶8. The plaintiff says that based on his training (he received law enforcement training at Northeast Wisconsin Technical College, id. at ¶2), he "knew that officer's will initially approach a vehicle in that manner, exposing only the face, as a safety precaution," and he says he didn't know that he was talking to a law enforcement officer until after the man moved. Id. at ¶¶ 9-10.

The plaintiff says that the man then asked him for his identification, but the plaintiff says that he knew from his training that he didn't have to provide identification unless he was being detained for committing a crime, so he asked

8

the officer if he was being detained. Id. at ¶¶11-13. The plaintiff asserts that the officer did not respond, and says that he told the officer that if he wasn't being detained, he wanted to leave. Id. at ¶15. The plaintiff says that at this point, the officer "ripped open the door" of the car and tried to grab the plaintiff by his arm, which caused the plaintiff to fear for his safety. Id. at ¶¶16-17. The plaintiff recounts that he told the officer, "get the fuck back, I don't know what the fuck you think you're doing, but this is illegal as fuck." Id. at ¶19. He says that the officer and the EMS staff member continued to try to grab him, and he continued to pull away; the officer then stepped back, he says, leaving only the EMS officer trying to pull the plaintiff out of the car. Id. at ¶20-21.

The plaintiff next says he saw the officer draw his taser; he indicates that he—the plaintiff—positioned the EMS staff member out of the way by extending [his] leg slightly, forcing him near the hinge of the door." Id. at ¶23. The plaintiff asserts the officer deployed his taser, yelling "taser!;" the plaintiff alleges that he caught the taser "by the wire behind the prongs and threw it to the ground." Id. at ¶¶24-25. At this point, the plaintiff says, he began yelling "Fuck you!" at the officer. Id. at ¶26.

The plaintiff contends that he then saw the officer approach his car with a baton; he says the officer "struck [him] twice in a row with the expandable baton in a forceful, jab-like motion." Id. at ¶¶27-28. The plaintiff says that as he started to double over in pain, the officer reached into the car, grabbed his arm, "yanked" him out of the car and "slammed [him] to the ground face first, using as much force as he could to press [the plaintiff's] face and shoulder to the ground." Id. at

9

¶29. He recounts that he was "pinned stomach flat on the ground," that he never reached for the officer's weapon and that it would have been physically impossible for him to do so given his position. Id. at ¶30. The plaintiff asserts that he never tried to flee, never lunged at the officer and was in a "defensive posture" from the moment the officer started to grab him until he was slammed into the ground face first. Id. at ¶¶31-33.

In his brief in opposition to the motion for summary judgment, the plaintiff doesn't dispute that the defendant arrived to find him unresponsive in his car in the McDonald's parking lot. Dkt. No. 57 at ¶¶1-10. He says, however, that while he can't prove it, there were no pedestrians in the parking lot other than the defendant and the ambulance crew member. Id. at ¶11. He disputes that his window was open when the defendant arrived. Id. at ¶14. He disputes the defendant's claim that he didn't respond when the defendant knocked on his window, claiming that he woke up, rolled down his window and talked with the defendant. Id. at ¶15. He denies that the defendant shouted "police." Id. at ¶16. He disputes that he only nodded when the defendant asked him if he was okay; the plaintiff says that he told the defendant that he was fine. Id. at ¶18. The plaintiff says that, based on the statements of witness Chandler and ambulance crew member Matthew Toebe, the plaintiff was responsive to the defendant when the ambulance crew arrived, and that the defendant had no reason to think that the plaintiff was having a medical issue or that he was under the influence of drugs. Id. at ¶¶19-20.

10

The plaintiff claims that the defendant is lying about the car starting to move; the plaintiff says the car never was in motion (despite acknowledging that in his statement, ambulance crew member Toebe says the car "lurched forward"). Id. at ¶22. The plaintiff says that this shows that both the defendant and Toebe fabricated their statements to make their actions seem reasonable. Id. The plaintiff also denies the defendant's claim that the plaintiff smelled of alcohol, arguing that if he had smelled of alcohol, "they would not have waited until after the search of the plaintiff's vehicle turned up empty alcohol containers, and the plaintiff had already been in the hospital for an extended period of time." Id. at ¶24. The plaintiff says the defendant never asked him to get out of the car. Id. at ¶¶25-29. He asserts that he did ask the defendant if he was being detained, but that that occurred before the defendant reached in the car door to grab him. Id. at ¶29. He denies that the defendant ever answered his question about being detained. Id. at ¶30.

While the plaintiff does not dispute the defendant's assertions about the plaintiff jerking away from the defendant, id. at ¶¶31-35, the plaintiff asserts that the defendant never called for backup, id. at ¶36. He does not dispute, however, that the defendant tasered him, or that he cursed at the defendant. Id.at ¶¶37-38. The plaintiff asserts that the "EMS staff member"—whom he assumes was Toebe—did not state his report that he reached into the car and tried to grab the plaintiff. Id. at ¶39. As for the defendant's assertion that he again asked the plaintiff to get out of the car after using the taser, the plaintiff responds that "the defendant never said a word between dropping the taser and maliciously striking

11

the plaintiff [sic] his baton." <u>Id.</u> at ¶41. The plaintiff disputes the defendant's assertions that the defendant continued to ask him to get out of the car, or that the defendant paused to assess the situation. <u>Id.</u> at ¶¶42-44.

The plaintiff says he never lunged at the defendant or put his head into the defendant's rib cage; he says that the defendant pulled him out of the car and slammed him face-first into the pavement. <u>Id.</u> at ¶¶45-46. Regarding the defendant's allegation that while he was trying to secure the plaintiff, the plaintiff's hands were near the defendant's waistband—and his gun—the plaintiff asserts that "it isn't possible to achieve that in the position the plaintiff was being held." <u>Id.</u> at ¶48. The plaintiff simply asserts, "[t]his is false" in response to the defendant's statement that the defendant tried to de-escalate the situation but that the plaintiff continued to resist and shout obscenities. <u>Id.</u> at ¶50. The plaintiff says he never made a move to spit at any of the deputies, but that they put the spit hood on him anyway. <u>Id.</u> at ¶52. Finally, the plaintiff admits being verbally abusive in the ambulance, but says he never was threatening. <u>Id.</u> at ¶54.

Paramedic Matthew Toebe submitted a witness statement indicating that when he arrived at the scene at about 1:33 a.m., he saw the defendant speaking with the plaintiff through a partially rolled down car window. Dkt. No. 52-3. He indicated that he got out of the ambulance and oved to the driver's side rear quarter panel of the plaintiff's car. <u>Id.</u> Toebe says that the defendant was trying to explain that "we were called to do a welfare check on an unresponsive or sleeping person in a running car." <u>Id.</u> He says the defendant opened the door, and that the plaintiff appeared to be "confused or disoriented during the conversation." <u>Id.</u>

12

Toebe says that the plaintiff asked if he was being detained, and that the defendant responded, "yes, until we determine that you are alright." Id. He indicates that the defendant asked the plaintiff to get out of the car. Id.

Toebe next describes that "[t]he vehicle started to roll forward and the deputy reached into the car towards the steering column to turn the vehicle off and shift it into park." Id. At that point, Toebe says, the plaintiff "made some kind of movements" and became "uncooperative/abusive." Id. Toebe says that the defendant withdrew from the car and began using stronger control talk." Id. Toebe, meanwhile, had moved to the defendant's left and rear, "near the edge of the open door." Id. He says the plaintiff had turned to face the defendant and "was leaning back over the center console;" Toebe says that the plaintiff "kicked at [the defendant] a couple of times" and Toebe perceived that some of those kicks may have hit the defendant. Id. He indicates that the defendant tried to pull the plaintiff out of the car by the leg, and that Toebe grabbed the plaintiff's right leg to try to help. Id. He says, however, that the plaintiff continued to kick. Id. The defendant then told the plaintiff that if he didn't get out of the car, he would be "Tazed." Id. Toebe says the defendant drew the taser and repeated that he would be forced to use it on the plaintiff. Id. Toebe says he let go of the plaintiff and stepped away from the car, and that after another kick from the plaintiff, the defendant used the taser. Id. Toebe says, however, that "the subject seemed to be only minimally effective, if at all." Id. He indicates that the car started to roll forward again, and that Toebe grabbed the door to stop the roll. Id. He recounts that the defendant was struggling with the plaintiff, "who was still mostly seated

13

in the driver's seat." Id. Toebe says that at that point, the defendant dropped the taser "and struck the [plaintiff] twice in the abdomen with the end of his baton in a short, jab like motion." Id. The defendant then began pulling the plaintiff out of the car, and Toebe reached in and shifted the car into park. At that point, a fire engine arrived. Id.

Toebe says that the plaintiff was "now down on the parking lot surface and [the defendant] was trying to control him by the shoulders and head from an above the head, over the back position." Id. He relates that the plaintiff was "fighting and turning his hips and kicking his legs." Id. Toebe says that he—Toebe—"laid on the [plaintiff's] midsection and tried to turn his hips so that he was flat on the ground." Id. He says that one of the firemen helped hold down the plaintiff's legs and shoulders, while another one secured the taser. Id. As more deputies arrived, the defendant cuffed the plaintiff behind his back, and after the stretcher was moved into position, the deputies put on the shackles and the spit hood. Id. As the plaintiff was assisted to the stretcher and seated on it, he continued to be verbally abusive. Id. Toebe says that the plaintiff continued to be verbally abusive and uncooperative as everyone went into the hospital. Id.

Witness Michael Chandler's statement indicated that he was at the McDonald's that morning with his family when he noticed a man parked in the car next to him who looked like he was sleeping. Dkt. No. 52-2. Chandler knocked on the passenger and driver windows but got no response. Id. Chandler went into the McDonald's and told management, then called the Brown County Sheriff's Department since the man was unresponsive. Id. He explains that a few

14

minutes later, he saw a "cop car" arrive and park near the man's car. Id. Chandler says that he "watched the officer knock on the window and saw the male wake up." Id. He says the man rolled his window down and Chandler could see the man and the officer talking. Id. Chandler relates that he turned around for a second, and that when he turned back, he saw the officer "trying to grab the male out of the car and the male was kicking at the officer." Id. He says that he saw the officer take out his taser, but that it "didn't seem to work." Id. Chandler says he saw the officer wrestle with the man and saw some county rescue workers helping the officer. Id. Chandler concludes by saying that the man was "still very aggressive towards the officer even after the officer gained control of him." Id.

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit."  See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). The court must "consider the evidence as a whole," de Lima Silva v. Wis. Dep't of Corrs., 917 F.3d 546, 559 (7th

15

Cir. 2019), and "view[] the record and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party," Laborers' Pension Fund v. W.R. Weis Co., Inc., 879 F.3d 760, 766 (7th Cir. 2018).

To survive a motion for summary judgment, the non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.   Excessive Force

The court allowed the plaintiff to proceed on a claim of excessive force. Dkt. No. 9. When an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). See also, Alicea v. Thomas, 815 F.3d 283, 288 (7th Cir. 2016) (citing Graham, 490 U.S. at 394 ("This type of §1983 excessive force claim originates from the Fourth Amendment's protection against unreasonable seizures.")). The court applies an objective reasonableness test, considering the reasonableness of the force based on the events confronting the defendant at the time and not on his subjective beliefs or motivations. See Horton v. Pobjecky, 883 F.3d 941, 949–50 (7th Cir. 2018) (citing

16

Graham, 490 U.S at 396–97, and County of Los Angeles, Cal. v. Mendez, ___ U.S. ___, 137 S. Ct. 1539, 1546–47 (2017)). This test carefully balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S at 396.

The balance "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The court must consider "the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances," without resort to "hindsight's distorting lens." Horton, 883 F.3d at 950 (citing Graham, 490 U.S. at 396, and Ford v. Childers, 855 F.2d 1271, 1276 (7th Cir. 1988)).

The defendant asserts that his actions were objectively reasonable in light of the plaintiff's refusal to follow the defendant's orders to step out of the car, the defensive posture the plaintiff took while in the car and the obscenities he repeatedly shouted at the defendant. Dkt. No. 50 at 10. The defendant recounts the plaintiff's odor of alcohol, the car's sudden lurch or roll forward and the busy conditions in the parking lot. Id. Under these conditions, the defendant contends, he had a reasonable fear for his safety and the safety of others and reasonably escalated his use of force in response to the increasing threat. Id. at 10–11.

17

The declaration[2] the plaintiff filed in May 2019 in response to the original motion for summary judgment states that the plaintiff certifies under penalty of perjury that it is true and correct, and it cites to 28 U.S.C. §1746. Dkt. No. 38 at 4. "[A] declaration under § 1746 is equivalent to an affidavit for the purposes of summary judgment." <u>Owens v. Hinsley</u>, 635 F.3d 950, 955 (7th Cir. 2011). A party opposing summary judgment may use an affidavit or declaration to do so

> only if the affidavit (1) attests to facts of which the affiant has "personal knowledge"; (2) "set[s] out facts that would be admissible in evidence"; and (3) "show[s] that the affiant or declarant is competent to testify on the matters stated." . . . Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007).

<u>James v. Hale</u>, 959 F.3d 307, 315 (7th Cir. 2020).

In the declaration, the plaintiff avers that the defendant ripped open the door to his car, tried to drag him out of it, tasered him, hit him with a baton and slammed him on the ground for no other reason than that the plaintiff told the officer that if the plaintiff wasn't being detained, he wanted to leave. Dkt. No. 38.

---

[2] The defendant asserts that "Plaintiff's entire opposition to the pending motion consists of responses to Defendant's proposed findings of fact." Dkt. No. 59 at 3. He says that "[e]ven if it is assumed that Plaintiff's response to the previously-filed motion for summary judgment is considered as part of Plaintiff's response to the pending motion," the plaintiff has not established a genuine issue of material fact. <u>Id.</u> The court has considered the declaration the plaintiff filed in response to the original motion for summary judgment, because while the court struck that original motion, it did not strike the plaintiff's response (see dkt. no. 34) and did not advise the plaintiff that he needed to re-file the response after the defendant filed his second summary judgment motion.

18

The court agrees with the defendant that many of the plaintiff's factual disagreements with the defendant are immaterial (as the defendant puts it, "[i]t is acutely clear that Plaintiff is manipulating minor and inconsequential differences in the statements in a misguided effort to create disputes of fact where none exist," dkt. no. 59 at 5)[3]. But the defendant over-simplifies the "undisputed" facts. The defendant claims that the following facts are undisputed:

> Plaintiff was found unconscious and unresponsive in a <u>running</u> vehicle in a full, busy parking lot; the key remained in the ignition during the course of the interaction; [the defendant] opened the door to check on Plaintiff; Plaintiff took a defensive posture with his feet in the air as if ready to kick [the defendant]; [the defendant] believed Plaintiff was trying to resist efforts to stabilize the situation; [the defendant] repeatedly told Plaintiff he needed to exit the vehicle; when Plaintiff did not exit, [the defendant] and, at some point, Mr. Toebe, tried to secure Plaintiff's arm and/or leg but Plaintiff repeatedly jerked away; [the defendant] again told Plaintiff he needed to exit the vehicle and warned Plaintiff that if he did not exit, [the defendant] would deploy his taser; due to Plaintiff's continued noncompliance and resistance, [the defendant] deployed his taser twice but it had no effect; Plaintiff became verbally abusive toward [the defendant] and still refused to exit the vehicle' due to Plaintiff's continued noncompliance and resistance, [the defendant] struck Plaintiff twice with his baton in order to gain compliance; and the assistance of several people was required to gain control of Plaintiff.

<u>Id.</u> at 5-6.

In fact, the plaintiff disputes that he was unresponsive. Depending on whether one looks at his declaration or his responses to the proposed findings of

---

[3] The plaintiff disputes whether the window of the plaintiff's car was rolled down before the defendant approached the vehicle, whether the defendant announced himself as a police officer, whether the plaintiff responded verbally or by nodding his head and when or how many times the defendant ordered the plaintiff to step out of the vehicle. These immaterial disputes would not preclude summary judgment. <u>See</u> <u>Montgomery</u>, 626 F.3d at 389.

19

fact, he disputes whether the parking lot was full or busy, whether he refused to get out of the car, whether he smelled of alcohol and whether the car started to roll away. He doesn't agree that the defendant opened the door to "check on" him, or that he needed stabilizing. Some of these disputes are relevant to the question of whether the force the defendant used was reasonable. If, as the plaintiff attests, he did nothing but ask the defendant some questions, then most of the defendant's actions would have been unreasonable; it would have been unreasonable for the defendant to pull the plaintiff out of the car, taser him, use the baton and take the plaintiff to the ground. If things happened the way the defendant says they did—the plaintiff was not responsive (even when the defendant shouted "police"), then did not comply with repeated commands to get out of the car; if the car began to roll forward (as the defendant and Toebe aver); if the plaintiff jerked away and kicked at the defendant and Toebe; and if the plaintiff did not respond when the defendant threatened to use the taser—the court would "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." Deering v. Reich, 183 F.3d 645, 652 (7th Cir. 1999) (quoting Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994)). The court would review each separate use of force throughout the encounter—pulling the plaintiff out of the car, using the taser, using the baton and eventually taking the plaintiff to ground—to determine whether each was reasonable "at the time the force [was] applied." Abbott v. Sangamon Cty., Ill., 705 F.3d 706, 724 (7th Cir. 2013).

20

The plaintiff's version of events strains credulity. It does not square with Toebe's account or with Chandler's. Parts of his declaration contradict his own responses to the defendant's proposed findings of fact. But "district courts presiding over summary judgment proceedings may not 'weigh conflicting evidence,' [*In re*] *High Fructose Corn Syrup* [*Antitrust Litig.*,] 295 F.3d [651], 655 [7th Cir. 2006], or make credibility determinations, *see Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) . . . ." Omnicare, Inc. v. UnitedHealth Group, Inc., 629 F.3d 697, 704 (7th Cir. 2011). The affidavit attests to facts of which the plaintiff would have personal knowledge—what happened in the car that morning at the McDonald's. It sets out facts that would be admissible in evidence—the plaintiff's version of events. And it shows that the plaintiff is competent to testify to the matters stated—he was there, and observed what happened with his own eyes. And as noted, the court must view all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party—the plaintiff.

Because the defendant's sworn version of the events and the plaintiff's sworn version differ in material respects, and because determining which of those versions to believe is the job of a jury, the defendant is not entitled to summary judgment as a matter of law.

C.    Qualified Immunity

The defendant argues that he is entitled to qualified immunity. Dkt. No. 50 at 12-14.

> Under the doctrine of qualified immunity, government officials are
> liable for civil damages—and subjected to suit in the first place—
> only when their conduct violated "clearly established statutory or

21

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 . . . (2009) (quoting *Harlaw v. Fitzgerald*, 457 U.S. 800, 818 . . . (1982)). Whether an official is entitled to qualified immunity on a motion for summary judgment turns on whether the plaintiff has both (1) alleged that the official committed acts violating a clearly established right and (2) adduced "evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts." *Mitchell v. Forsyth*, 472 U.S. 511, 526 . . . (1985)

Balsewicz v. Pawlyk, 963 F.3d 650, 656 (7th Cir. June 26, 2020).

The court has determined that the plaintiff has established some genuine disputes regarding facts material to whether the levels of force the defendant used were reasonable. The question, then, is whether the plaintiff's version of events, if true, involved conduct that violated a clearly established right. In other words, the court looks at "whether the [defendant] had fair notice that [his] conduct was unlawful." Id. at 656-57 (quoting Kisela v. Hughes, ___ U.S. __, 138 S. Ct. 1148, 1152 (2018)).

It has long been established law that an officer who uses more force than is reasonably necessary based on the totality of the facts and circumstances known to the officer at the time the force is applied violates the Constitution. Abbott v. Sangamon Cty., Ill., 705 F.3d 706, 724 (7th Cir. 2013) (citing cases). The plaintiff had a clearly established right not to be subjected to more force than was required by the circumstances. There are factual disputes about how much force was required—the plaintiff implies that *no* force was required because he did nothing but wake up to find the defendant looking at him, ask the defendant what the defendant wanted and then defend himself and protest an unprovoked attack, while the defendant describes a gradual escalation of force as the plaintiff

22

went from unresponsive to belligerent to combative, resistant and abusive. But the question when considering qualified immunity is whether, if the disputes of material fact are resolved in the plaintiff's favor, the defendant's actions violated the plaintiff's rights under the Constitution. The answer to that question is yes, which means that the defendant is not protected by qualified immunity.

## III.    Conclusion

The court **DENIES** the defendant's motion for summary judgment. Dkt. No. 49.

More than once, the plaintiff has asked the court to appoint counsel to represent him. Dkt. Nos. 8, 20, 36. The court now will attempt to recruit counsel to represent the plaintiff. The plaintiff need do nothing more at this point. Once counsel has been recruited, the court will send the plaintiff a form to sign and return if he wishes to proceed with the recruited counsel.

Dated in Milwaukee, Wisconsin this 12th day of August, 2020.

BY THE COURT:

HON. PAMELA PEPPER
**Chief United States District Judge**

23